# In the United States Court of Federal Claims

**No. 06-676C**
**(Filed: September 29, 2006)**

**ORDER IS FILED UNDER SEAL**

* * * * * * * * * * * * * * * * *
*
**CWS MARKETING GROUP, INC.,** *
*
**Plaintiff,** *
*
**v.** *
*
**THE UNITED STATES,** *
*
**Defendant.** *
*
* * * * * * * * * * * * * * * * *

## ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

This case comes before the court on a motion by the plaintiff, CWS Marketing Group, Inc. ("plaintiff" or "CWS"), for a temporary restraining order ("TRO") in a bid protest action.[1] CWS seeks a TRO to stay the performance of a government contract. Specifically, CWS asks the court to enjoin the United States Customs and Border Protection ("CBP"), the unified border agency within the Department of Homeland Security ("DHS"), from proceeding with a contract for vehicle consignment and disposal

---

[1]The plaintiff also seeks a preliminary injunction, but given the immediacy of the government's needs, the court has focused only on the TRO; time did not allow for the government to collect or the court to review the Administrative Record.

services that was awarded under Solicitation No. HSBP1006R0644 ("Solicitation") to Rod Robertson Enterprises ("RRE"). At issue before the court is whether, under the four part balancing test detailed below, a temporary restraining order is appropriate at this time.

The following facts are taken from the plaintiff's motion and from the hearing held on September 28, 2006. Currently, CWS, under a subcontract with EG&G Technical Services, Inc. ("EG&G") that is funded by the Department of the Treasury, provides the government (CBP, IRS, and other agencies) with vehicle consignment and disposal services. In particular, CWS provides disposal services for seized and forfeited vehicles valued at $10,000 and less. The CWS subcontract, together with the much larger EG&G contract, terminates on September 30, 2006. Following this termination, the Department of the Treasury will no longer be funding the contract and CBP will for the first time be solely responsible for the management and disposal services for vehicles, seized by CBP, valued at $10,000 or less. In anticipation of this, on March 10, 2006, CBP issued the Solicitation, which contemplated the award of a fixed-price contract with a base term of one year and four one year options. The Solicitation sought a small business contractor to provide consignment and disposal services for seized and forfeited vehicles valued at $10,000 and less along the southwest border of the United States, including Texas, Arizona, New Mexico, and California.

On April 27, 2006, CWS submitted a timely proposal to CBP. On August 31, 2006, CBP notified CWS that CWS would not receive an award under the Solicitation. That same day, CBP awarded the contract to RRE, which was another subcontractor

under the original EG&G contract. In an e-mail to CBP on September 1, 2006, CWS requested a post-award debriefing. On September 6, 2006, CBP provided CWS a debriefing, during which CBP revealed that the primary reason that CWS was not awarded the contract was that CWS's price was higher than RRE's price. Apparently, CWS's price was approximately four times higher than RRE's price and than the price identified in the independent government cost estimate ("IGCE").[2]

The plaintiff contends that CBP intends to modify its contract with RRE to include government furnished equipment ("GFE") that was specifically not covered by the original contract under the Solicitation.[3] As such, the plaintiff argues that such modifications represent cardinal changes to the original contract, which would require a new solicitation under the full and open competition requirements set forth in the Competition in Contracting Act of 1984, 41 U.S.C. § 253 et seq. (2000) ("CICA"). Furthermore, the plaintiff contends that CBP's evaluation of the RRE proposal was flawed, and that CBP accepted the prices included in RRE's proposal without adequately analyzing their reasonableness. The plaintiff asserts that the price difference between

[2]The government discussed the IGCE at the September 28, 2006 hearing and provided the court and the plaintiff with a copy of the IGCE later that afternoon. Apparently, there was another bid which was also in the range of both the RRE bid and the IGCE. The court is in receipt of plaintiff's supplemental memorandum addressing flaws in the IGCE. These flaws will need to be addressed in future proceedings.

[3]The plaintiff's initial complaint and motion included allegations that the government was planning to modify its contract with RRE to include the government's current inventory of vehicles, which was explicitly excluded from the Solicitation. However, the government, on September 28, 2006, entered into a separate, sole source contract with RRE to handle the current inventory. As such, this aspect of the plaintiff's complaint is moot.

CWS's bid, which CWS based on its past costs, and RRE's bid should have triggered a closer investigation. Based on these allegations, on September 27, 2006, the plaintiff filed a motion for a temporary restraining order and preliminary injunction, asking the court to stay performance of the contract between CBP and RRE.

A hearing on this motion was heard on September 28, 2006. At this hearing, the court heard testimony from C. William Stearman, President of CWS, who testified about the harm CWS would suffer if the award is not set aside and further explained why the plaintiff waited more than 20 days before seeking any emergency relief before this court or another forum.[4]

For the reasons set forth below, the plaintiff's motion for a temporary restraining order is **DENIED**.

**DISCUSSION**

This court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000). PGBA, LLC v. United States, 389 F.3d 1219, 1224 (Fed. Cir. 2004). At issue before the court is whether the plaintiff is entitled to a temporary restraining order, which would prevent CBP from proceeding with a contract with RRE. In determining whether to grant a motion for a temporary restraining order, the court must

[4]At the hearing, Mr. Stearman testified that the plaintiff made a strategic decision regarding whether to immediately seek relief following the post-award debriefing, and that in particular the plaintiff was concerned about jeopardizing any future contracts with the government. CWS was at that time in discussions with the government about a few potential contracts related to vehicle management along the southwest border. Once CWS learned that it would not be awarded these contracts, it decided to file suit.

weigh the following four factors: (1) whether the plaintiff is likely to succeed on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether granting the requested relief would serve the public's interest. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 621 (2005); W&D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997) (stating that in deciding if a TRO is appropriate, "a court uses the same four-part test applied to motions for a preliminary injunction."). "No one factor, taken individually, is necessarily dispositive. . .the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). The issuance of a TRO is at the discretion of the trial court. PGBA, 389 F.3d at 1223. The court will consider each of these factors individually.

**A. Likelihood of Success on the Merits**

The plaintiff contends that it will likely succeed on the merits of its claim because it will show that: (1) CBP's decision to modify its contract with RRE to include the transfer of additional GFE violated the full and open competition requirements of CICA;[5] and (2) CBP's award of the contract to RRE was improper because of CBP's failure to appropriately evaluate the reasonableness of RRE's proposed prices.

[5] As discussed supra (see footnote 1), the court will not address, at this time, the separate issue of the management of the government's current inventory of vehicles, as this is being handled through a new contract between CBP and RRE. To the extent that CWS wishes to object to the sole source award before this court, it will need to file an amended complaint and a new motion for injunctive relief.

The court reviews actions challenging the award of a government contract according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2000) ("APA"). According to the APA, the reviewing court may overturn an agency action only if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In order to prevail, the plaintiff must demonstrate by a preponderance of the evidence that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The court "is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

**1. Did the GFE trigger CICA Requirements?**

The plaintiff contends that the government has modified its contract with RRE to include the transfer of GFE, which the Solicitation expressly advised would not be covered by the contract. However, the plaintiff alleges, based on information received from EG&G, that the government now intends to transfer GFE, including forklifts, motorized utility carts, computer equipment, and office supplies to RRE at the outset of the performance of the contract. Accordingly, the plaintiff contends that the government (specifically, CBP) has modified the contract and that these modifications constitute cardinal changes which trigger the full and open competition requirements under CICA.

In response, the government asserts that it is EG&G, and not the government, that

has possession of and is making the transfer of the GFE and that the government has not changed the contract. The government argues in the alternative that even if the government is transferring GFE to RRE, the transfer is not material because it is not altering the terms of the contract. The government contends that the transfer of the GFE does not materially change the nature of the work performed.

The court must consider whether a material difference exists between the modified contract and the original contract awarded by the agency in determining whether the modification triggers the competition requirements in CICA. See CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 574 (2004). "[A] cardinal change. . .occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." AT&T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed. Cir. 1993). In this case, even assuming CWS's allegations are true, the government is correct that the transfer of GFE does not constitute a material change because the transfer does not alter the required work in a manner which requires the contractor to perform materially different duties. CWS's allegation that knowledge of the transfer of GFE would have resulted in a different bid is immaterial, because none of the potential bidders were aware that the winning bidder would receive the above mentioned GFE, and each bidder formulated its bid based on the presumption that the GFE would not be available. The plaintiff's bid was still substantially higher than the other bids, including RRE's bid and the IGCE. Accordingly, the plaintiff is not likely to prevail on the merits of the claim that

the transfer of the GFE to RRE is a material modification to the contract and triggers the requirements of CICA.

**2. Was the Contract Award Process Defective?**

The plaintiff argues that CBP's evaluation of RRE's proposal for the work requirements set forth by the Solicitation was seriously defective because the proposed prices were substantially lower than the actual costs to perform the requested work, and accordingly the proposed prices reflect a failure to address the scope of work required under the Solicitation. The plaintiff contends that because CBP accepted the proposed prices without appropriately analyzing their reasonableness, CBP awarded the contract to RRE improperly. In particular, the plaintiff asserts that under the Federal Acquisition Regulations ("FAR"), specifically FAR § 15.404-1, the government should have relied upon EG&G's actual costs to perform the work as a proper gauge of prices. In response, the government argues that its price evaluation did not violate the FAR and was reasonable. The government contends that CBP properly relied on the IGCE, and the fact that there were two bids within the IGCE range supports this contention.

The Solicitation was conducted pursuant to the procedures set forth in the FAR, and required a price analysis to determine the reasonableness of the proposed prices. A price analysis "is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR § 15.404-1(b)(1). Under FAR § 15.404-1(b)(2), possible techniques to be used in price analysis include: comparison of proposed prices received in response to the solicitation; comparison of

previously proposed prices and previous government contract prices; comparison with competitive published price lists; comparison of proposed prices with independent government cost estimates; and comparison with prices obtained through market research. FAR § 15.404-1(b)(3) states that the first two above-listed techniques are the preferred techniques. "However, if the contracting officer determines that information on competitive proposed prices or previous contract prices is not available or is insufficient to determine that the price is fair and reasonable, the contracting officer may use any of the remaining techniques as appropriate to the circumstances applicable to the acquisition." Id.

The court finds that the plaintiff is not likely to prevail on the merits of its price evaluation claim. The court has rejected similar claims on a number of occasions. See, e.g., CC Distributors, Inc. v. United States, 69 Fed. Cl. 277, 283 (2006); Labat-Anderson, Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); W&D Ships Deck Works, 39 Fed. Cl. at 648. Indeed, even if CWS is correct that RRE's bid was below cost, that would not be grounds for rejecting the government's decision. The fact that a bid is below cost does not, on its face, make that bid unreasonable. CC Distributors, 69 Fed. Cl. at 283. "Importantly, in fixed-price contracting, 'below-cost pricing is not prohibited and the government cannot withhold an award from a responsible offeror merely because its low offer is below cost. . .[T]he contract places upon the contractor the risk and responsibility for loss.'" Id. (quoting Family Realty, Comp. Gen. Dec. B-247,772, 92-2 C.P.D. ¶ 6,

1992 WL 167007, *2 (July 6, 1992)). Moreover, contrary to CWS's contentions, the court does not have reason to believe that RRE's bid is in fact below cost, given its proximity to the IGCE and the fact that another bid was submitted at a similar price. Thus, the court finds that the plaintiff is unlikely to succeed in its claim that CBP's decision to award the contract to RRE without further evaluation violated the FAR and was unreasonable on its face.

**B. Weighing of the Respective Harms**

The plaintiff claims that it will suffer irreparable harm if the court does not grant a temporary restraining order. In particular, the plaintiff contends that if RRE is able to proceed with the performance of the contract, RRE will receive an unfair competitive advantage in any future resolicitation, and CWS will lose both profits and valuable and experienced employees. CWS claims that it will suffer non-compensable lost profits that it would have earned from selling the current inventory of seized and forfeited vehicles, and will also lose future revenue that it would have earned had it been awarded the contract.

Typically, monetary loss is not considered an "irreparable" injury. See, e.g., Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3rd Cir. 1988). "However, there are occasions, particularly in the arena of government contracting, in which an economic loss will not be compensable with money damages; in these situations, economic loss can rise to the level of irreparable injury. Accordingly,

this court has found that lost profits, or even the loss of an opportunity to earn profits, is 'sufficient to constitute irreparable harm.'" Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005) (quoting Hospital Klean, 65 Fed. Cl. at 624). In Hospital Klean, the plaintiff claimed that, absent injunctive relief, it would lose the opportunity to earn the profit it would have earned had it been awarded the contract. The court held that this argument was sufficient to constitute irreparable harm. Id. Here, the plaintiff's contentions that, absent a temporary restraining order, it will lose profits and employees could qualify as "irreparable harm." However, the court must balance the plaintiff's potential harm with that of the government.

The government contends that it will suffer irreparable harm if the temporary restraining order is granted. Because the government's current contract providing for the management and disposal of seized and forfeited vehicles valued at $10,000 and less terminates on September 30, 2006, the government argues that if a temporary restraining order is issued, no alternative mechanism will exist for managing and disposing of any additional vehicles which are seized or forfeited after September 30, 2006. The government claims that the lack of such a mechanism could result in breaks in the chain of custody, lost or misplaced vehicles, and lost revenue from vehicle auctions.

In the present case, the balance weighs in favor of the government. The plaintiff did not file a protest with the Government Accountability Office or a claim in this court when it first learned of RRE's award on August 31, 2006, nor following the debriefing on September 6, 2006, but instead waited until September 27, 2006, three days before

EG&G's contract was set to expire. Therefore, CBP is very limited in its ability to find an alternative vehicle management option. At the September 28, 2006 hearing, the government discussed the efforts it had made, on behalf of CBP, to obtain the assistance from the Department of the Treasury (which holds a bridge contract to handle vehicles valued at more than $10,000), but was unsuccessful because the Treasury's bridge contractor does not have the capacity to handle the large volume of vehicles required to be managed under the contract between the government and RRE. Additionally, because the transition period in the government's current contract has lapsed, and RRE has been preparing to begin performance of the contract for the past month, the incumbent is no longer in a position to assume the necessary responsibilities. In Hospital Klean, the court held that the government would not be harmed because "the government has alternative contractual vehicles available through which it can continue to obtain the needed services uninterrupted." 65 Fed. Cl. at 624. Here, because the plaintiff waited 20 days to file its request for the TRO, the government in this case has no "alternative contractual vehicles" to manage any of the vehicles valued under $10,000 seized or forfeited along the southwest border of the United States after September 30, 2006.[6] The court finds that the immediacy of this need, and lack of any alternative options, would, if a temporary restraining order were granted, pose an irreparable harm to the government.

---

[6]As discussed supra, footnote 4, at the September 28, 2006 hearing Mr. Stearman testified regarding the plaintiff's reasons for waiting to file a complaint. The court is not persuaded that those reasons justify the delay, and the burden that the delay has placed on the government.

### C. The Public's Interest

The final factor to consider in evaluating a motion for a temporary restraining order is the public's interest. The plaintiff contends that injunctive relief would serve the public's best interest by preserving the integrity of the procurement process by requiring the government to follow its own laws and regulations. The government claims that a temporary restraining order would have a detrimental effect on the public's interest because it would result in wasted resources and the inability to manage and dispose of vehicles which are seized or forfeited along the southwest border of the United States.

The plaintiff is correct that there is a public interest in preserving the integrity of the procurement process. See, e.g., Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994); Hospital Klean, 65 Fed. Cl. at 624; Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003). However, the public interest in this case weighs in favor of the government. The immediate and significant impact on the public if CBP did not have a contractor in place to transport, store, and dispose of seized and forfeited vehicles on September 30, 2006 is substantial and tips the balance in favor of the government.

## CONCLUSION

The court, in considering the factors relevant to the temporary restraining order determination, concludes that the plaintiff is not likely to succeed on the merits, the balance of harms weighs against the plaintiff, and the public interest supports the denial of injunctive relief. Accordingly, the court **DENIES** the plaintiff's motion for a

temporary restraining order. The court will set an expedited schedule for resolution of this case on the merits.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge