Electronically filed on October 13, 2006

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| CWS MARKETING GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-676C |
| v. | ) | |
| | ) | **Agreed-Upon Redacted Copy –** |
| UNITED STATES OF AMERICA, | ) | **May Be Made Public** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**AMENDED COMPLAINT FOR DECLARATORY RELIEF**

For its Amended Complaint against Defendant United States, Plaintiff CWS Marketing Group, Inc., by undersigned counsel, states as follows:

**NATURE OF THE ACTION**

1. Plaintiff CWS Marketing Group, Inc. ("CWS") by this Complaint, respectfully seeks injunctive and declaratory relief against the United States, acting through United States Customs and Border Protection ("CBP" or "the Agency"), in the form of one or more orders granting appropriate relief in response to CWS's challenges to improper government procurement actions and improper contract awards to Rod Robertson Enterprises, Inc. ("Robertson").

**PARTIES**

2. Plaintiff CWS is a woman-owned and operated small business. CWS is a transaction specialist, advising the Government on asset disposal and facilitating advertising, marketing, and sales of Government assets. For many years, CWS has provided disposal services to the Government for seized and forfeited vehicles valued at $10,000 and less under a

subcontract with EG&G Technical Services, Inc. ("EG&G") (the "CWS Subcontract"). EG&G held the prime contract for management and disposal of a wide array of personal property (the "EG&G Contract"), including the seized vehicles that CWS had handled under the CWS Subcontract. The CWS Subcontract period of performance ended on September 30, 2006.

3. Pursuant to the Agency's Vehicle Consignment and Disposal Services procurement under Solicitation No. HSBP1006R0644 (the "Solicitation"), a new small business contractor is to provide consignment and disposal services for seized and forfeited vehicles, valued at $10,000 and less, anywhere within the southwest United States border states of Texas, Arizona, New Mexico, and California. In response to the Solicitation, CWS submitted a proposal to perform the solicited services.

4. The Defendant is the United States acting through CBP. CBP is the unified border agency within the Department of Homeland Security ("DHS"). CBP was created on March 1, 2003. CBP combined the inspectional workforces and broad border authorities of the United States Customs Service, the United States Immigration and Naturalization Service, Animal and Plant Health Inspection Services, and the United States Border Patrol.

**JURISDICTION AND VENUE**

5. This Court maintains jurisdiction and venue over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).

**FACTUAL BACKGROUND**

6. The Competition in Contracting Act ("CICA") requires that agencies obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter and the Federal Acquisition Regulation (the "FAR").

**A. The Solicitation and Work Requirements**

7. On or about March 10, 2006, CBP issued Solicitation No. HSBP1006R0644 as a total small business set aside to acquire consignment and disposal services for vehicles valued at $10,000 or less that are seized and forfeited in the southwest border states of California, Arizona, New Mexico, and Texas including pick-up and management of seized vehicles, disposition of vehicles, data entry for tracking seized and forfeited property (from case initiation to final resolution), determining the fair market value of conveyances, and accounting and finance activities.

8. The Solicitation contemplated award of an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract, with fixed prices for various services, having a base term and four one year options. The Solicitation contemplated a base year of one contract line item number ("CLIN") with 12 subparts:

| | |
|---|---|
| CLIN 0001 A | Pre-seizure Activity |
| CLIN 0001 B | Towing/Transportation |
| CLIN 0001 C | Consignment |
| CLIN 0001 D | Receipt and Transfer |
| CLIN 0001 E | Storage |
| CLIN 0001 F | Vehicle Identification and Physical Accountability |
| CLIN 0001 G | Vehicle Maintenance |
| CLIN 0001 H | Vehicle Disposition Procedure (Remit) |
| CLIN 0001 I | Vehicle Disposition Procedure (Sale) |
| CLIN 0001 J | Vehicle Disposition Procedure (Destruction /Dismantle) |
| CLIN 0001 K | SEACATS |
| CLIN 0001 L | Monthly Management Report |

9. The Statement of Work ("SOW") identified multiple services to be provided, including, but not limited to: seized vehicle management, vehicle disposition, Seized Asset and

Case Tracking System ("SEACATS") access and operation, Fair Market Value ("FMV") of conveyances determination and documentation, accounting and finance, seized property sales reports, transfer of funds to the United States Department of Treasury, and monthly management reports.

10. The SOW's required seized vehicle management services included: 1) pre-seizure services (including towing, dropping and replacing gas tanks in vehicles, providing services to facilitate inspection to identify illegally built compartments, breakdown of tires, movement of conveyances to CBP x-ray facilities, transfer of vehicles to and from locations for inspection services); 2) consignment services; 3) receipt and transfer of vehicles; 4) transportation for all seized and forfeited vehicles; 5) storage of vehicles, including use of CBP's Government Owned Contractor Operated storage facility, known as the Pringle Seized Vehicle Facility ("PSVF" or the "GOCO facility"), in San Diego; 6) vehicle identification and physical accountability (including maintaining files of vehicle inspection reports and records related to the receipt, transfer, condition, storage, and disposal of the vehicle); 7) providing access to all seized and forfeited vehicles in storage (including maintaining a log of all individuals who enter and exit the storage facility); and 8) vehicle maintenance.

11. The SOW estimated the approximate number of vehicles, which may require the following services:

| | |
|---|---|
| Pre-seizure activity | 2,400 |
| Towing/transportation | 33,000 |
| Consignment | 33,000 |
| Receipt and transfer | 33,000 |
| Storage | 3,000 |
| Vehicle identification and Physical accountability | 33,000 |
| Vehicle maintenance | 2,000 |
| Vehicle disposition (remit) | 2,000 |
| Vehicle disposition (sale) | 19,000 |

| | |
|---|---|
| Vehicle disposition (destruction/dismantle) | 2,000 |
| SEACATS | 33,000 |
| Monthly reports | 12 |

12. The SOW required the Contractor to take over operation and maintenance only of the PSVF in San Diego. CBP would not be providing any additional facilities. The SOW required the Contractor to propose all other storage locations and facilities.

13. The Solicitation provided that the Government would provide no Government Furnished Equipment ("GFE"), except for office furniture and the barcode system at the San Diego PSVF. The Government would not be providing forklifts, motorized utility carts, wash equipment, or any other equipment. Offerors were required to propose prices that would cover costs for all such equipment needed for full contract performance.

14. Vehicle disposition methods outlined in the SOW included: remission, retention by the Agency for official use, transfer to another Federal, state, or local agency, donation, sale, and dismantling and destruction. The primary disposal method for vehicles valued at $2501 or more is by sale at auction. The primary disposal method for vehicles valued at $2500 or less is to sell the vehicles to licensed dismantlers. The SOW required the contractor to complete required paperwork and maintain records relating to all dispositions. Required paperwork included maintaining hard files, the SEACATS system, Government forms, preparing reports required by the SOW, line item accounting, and all other information required by CBP for auditing purposes.

15. The SOW identified numerous forms that the Contractor must complete.

16. The SOW required the Contractor to prepare and submit to appropriate officials all applicable paperwork as required by the individual States where vehicles are dismantled and

destroyed. The SOW required the Contractor to document any vehicle destruction. The Contractor must possess all required permits, bonds, and licenses required to do this business.

17. Additional paperwork required by the SOW included obtaining a signed and notarized Hold Harmless Release Agreement from the person receiving the property when a vehicle is remitted to the owner/violator, providing the purchaser with a Notice of Award and receipt for each purchase, preparing formal transfer documents for all vehicles sold to the public and forwarding the documents to the Field Contracting Officer Technical Representative ("COTR") for approval. The SOW also required the Contractor to maintain documentation to support the basis for its FMV determinations.

18. The SOW required the Contractor to submit seized property sales reports to the National Finance Center ("NFC"). These reports include: Monthly Summary Report of Sales to Date, Monthly Schedule of Sales for Remainder, Credit Card Reconciliation Reports, Sales Closeout Packages (including items sold, buyers invoices, deposit slips for total sale), and a complete Sale Package (including a Sale Report with revenue and costs). The Contractor must also deliver to NFC a Monthly Cash Transfer Report, including sales collections and non-sales collections. Additionally, the Contractor must deliver monthly bank statements to NFC.

19. The SOW required the Contractor to arrange and conduct the sale of vehicles, including advertising the sale of vehicles and distributing sales information and catalogs.

20. The Solicitation required the Contractor to use SEACATS to accommodate the recording, accounting, and reporting of the applicable requirements and elements of information listed in the SOW. The Agency's data requirements for SEACATS are directly related to the number of vehicles consigned to the Contractor.

21. SEACATS is the cradle-to-grave system for tracking seized and forfeited property from case initiation to final resolution. SEACATS is the system of record for all law enforcement bureaus participating in the Forfeiture Fund. SEACATS has been designed to produce auditable financial statements for both the Forfeiture Fund and the Customs forfeiture program and to meet all external requirements for seized and forfeited property, penalties, and liquidated damages.

22. SEACATS supports several, varied business processes each having different activities and data needs. SEACATS also supports several user organizations with varying levels of authority, different information needs, and unique perspectives. For example, SEACATS is used to prepare CBP and DHS-wide financial statements for the forfeiture program, track and account for the physical inventory of seized and forfeited property, including tracking storage, transportation, repair, maintenance, sale, destruction, transfer, donation, and remission of specific property items. The Contractor also uses SEACATS to create auction lots and record sales proceeds.

23. The Solicitation included a 178 page SEACATS user's manual that presented descriptions and data requirements for each function or processing step. This manual presented different types of tasks or processing functions that the Contractor may wish to perform. The manual included pictures of sample SEACATS screens for each function in order to familiarize the user with the dozens of screens he or she may encounter while using SEACATS.

24. SEACATS support covers four basic areas and numerous types of data, including but not limited to the following:

- Property Management
    - Seizure and line item information
    - Property consignment acknowledgement with estimated date and time of pickup

- Property acceptance record with actual date and time picked up
- FMV assigned to each line item
- Condition assigned to each line item
- Quantity and unit of measure of each line item
- Storage information, including vendor identification, dimensions, recurring charge, date stored/removed
- Maintenance information, type, recurring cost
- Transportation information, type, vendor identification, date, cost
- Status of the property using a five-digit code indicating the current status of the property
- Disposition instructions
- Date disposition instructions were accomplished
- Split line items, upon request from seizing agency

- Finance and Accounting
  - Posting of expenditures to the seizure line items or sale
  - Vendor network data including assigning vendor identification
  - Sales deposits by type with identification numbers and amounts
  - Revenue allocation to the seizure line item

- Sales and Marketing
  - Sales schedules with sale number, sale type, location, date, and manager
  - Sales assignment of property to sales and lots
  - Sales collections and bidder number by lot for allocation to line items

- Reports
  - Standard reports for inventory, statistical, financial, and sale information
  - Sales packages for submission to NFC
  - Ad hoc reports via the Report Program Generator

25. The Contractor must update SEACATS records numerous times throughout the life cycle of the seized vehicle based on consignment orders, CBP forms, sale revenue reports, and vendor invoices. Many activities require access to multiple SEACATS data entry screens to complete one transaction. For example, vehicle acceptance involves entering data on eight separate screens and recording vendor costs requires access to four screens. Therefore, a workload of 33,000 seizures will translate into data maintenance in over a half a million screens.

26. The SOW required the Contractor to perform the following functions related to SEACATS: (a) provide equipment, personnel, space, power, environmental controls, a communications line (usually a T-3 line), and operator(s), as needed to meet the requirements of the contract; (b) be responsible for data input, updates, and maintenance of the information specified within the Property Contractor Transaction User Guide for SEACATS; and (c) enter all information within two working days from the date the action was completed, except the sale of vehicles which shall be entered within five working days after vehicle release.

27. In responses to questions, CBP stated that the SEACATS system shall be separate from the Contractor's e-mail and administrative system. The Contractor must also provide computer equipment for the SEACATS system.

28. All Contractor employees requiring access to SEACATS must successfully pass a CBP personal background investigation prior to gaining access to the SEACATS system. The Solicitation required the Contractor to provide the COTR with completed security packages for each employee needing access to SEACATS within 10 calendar days after award of the contract. The SOW required submission of packages for new employees at least ninety days prior to the date access is required in order to complete the investigation.

29. The SOW required the Contractor to propose its own financing/accounting system and auctioneering/cashiering system. These systems must track all costs, meet audit requirements, and comply with cost accounting standards. These systems must record and report all aspects of the vehicle management and sales information. The Contractor is required to adhere to the standards, criteria, and regulatory requirements for accounting and financing as mandated by CBP.

30. The Solicitation required that the Contractor's accounting system identify all revenue and expenses including direct and indirect costs to the individual line item. CBP required this line item accounting in order for CBP to meet financial reporting requirements.

31. CBP required in the Solicitation that any offeror's public website be compliant with section 508 of the Americans with Disabilities Act.

32. The contract contemplated by the Solicitation is a services contract. Consequently, human resources are instrumental to every component of the contract. Without adequate personnel qualified to perform the work required by the SOW, a contractor may not perform the technical or management functions of the contract successfully.

33. The Solicitation included wage determinations for the applicable market.

34. There were approximately 8,000 vehicles in inventory under the EG&G Contract (the "current inventory" or "vehicles currently in inventory"). CWS had been disposing of these vehicles pursuant to the CWS Subcontract. During the Solicitation, CBP repeatedly stated that it would not transfer any seized and forfeited vehicle currently in storage throughout California, Texas, New Mexico, and/or Arizona to the successful offeror. This includes the vehicles currently stored at PSVF and at an EG&G storage facility in Nogales, Arizona.

35. Because the contract startup contemplated in the Solicitation included zero vehicles, each offeror would need to build set-up costs into its pricing proposal, including costs arising from leasing locations and obtaining equipment needed to perform the work required by the Solicitation.

**B. Proposal Evaluation Requirements and Contract Award**

36. Section M of the Solicitation stated that award can only be made to an offeror whose proposal was technically acceptable/or represents best value; whose cost/price was

determined reasonable; and who was considered to be responsible within the meaning of FAR § 9.104.

37. Section L of the Solicitation stated that the Technical Proposal should have been sufficiently specific, detailed, and complete as to clearly and fully demonstrate that the offeror had a thorough understanding of the requirements set forth in the Solicitation. Section L further explained that the Contractor must have explained its proposed technical approach and demonstrated a clear understanding of the nature of the work being undertaken.

38. Section L required the offeror to identify all proposed subcontractors and consultants.

39. A technical evaluation team was to have evaluated proposals responding to the Solicitation based on the offeror's Technical Approach, Management Approach, and Past Performance. The Technical Approach was designated as more important than the Management Approach and Past Performance. The Management Approach and Past Performance were weighted equally.

40. Evaluation of the Technical Approach was to have been based on three sub-factors of equal weight: Understanding of the Requirements (comprehension of the work requirements and understanding the complexity and level of effort required), Technical Approach (specifically addressing Vehicle Management, Accounting and Finance, SEACATS Implementation, and Sales and Marketing), and Problems and Resolutions.

41. Evaluation of the Management Approach was based on two sub-factors of equal weight: Organizational Structure (including procedures for supporting this effort) and Contract Management (procedures for communicating with the Government, managing subcontractor resources, and managing the financial responsibilities as defined in the SOW).

42. The Solicitation required the technical evaluation team to assign adjectival ratings of "Outstanding," "Highly Satisfactory," "Satisfactory," "Marginal," or "Unsatisfactory" to each offeror's technical proposal.

43. Section M.4 of the Solicitation required the Agency to conduct a price analysis of the offerors' price proposals in response to the SOW in addition to the technical evaluation. *See* FAR § 15.404(a). Pursuant to the Solicitation, the Agency's price analysis could have included a comparison of proposed prices received in response to the Solicitation, a comparison of previously proposed prices and previous Government and commercial contract prices with current proposed prices for the same or similar services if both the validity of the comparison and the reasonableness of the previous price(s) can be established, and/or a comparison of proposed prices with prices obtained through market research for the same or similar service. *See* FAR 15.404-1(b).

44. The Solicitation indicated that CBP would make the award to the offeror whose proposal provided the best value to the Government. The best value would be determined by a trade-off analysis, comparing differences in the value of the technical features with differences in cost to the Government. In making this comparison, the Government was more concerned with obtaining superior technical features than making an award at the lowest overall cost to the Government.

45. On April 27, 2006, CWS submitted a timely proposal to CBP.

46. The Agency has reported that Robertson and one other offeror also submitted a proposal in response to the Solicitation.

47. The Agency notified CWS by e-mail dated August 31, 2006 that CWS would not receive award under the Solicitation. CWS received a letter to this effect on August 31, 2006.

48. That same day, CBP awarded a contract to Robertson (the "Robertson Contract") in the amount of $21,849,500, including $4,384,900 for the base year, $4,384,900 for Option 1, $4,369,900 for Option 2, $4,354,900 for Option 3, and $4,354,900 for Option 4.

**C. Post-Award Debriefing**

49. In an e-mail to the Agency dated September 1, 2006, CWS requested a debriefing.

50. On September 6, 2006, the Agency provided CWS a post-award debriefing regarding the Robertson Contract award.

51. At the September 6, 2006 debriefing, CBP revealed that the technical evaluation team assigned an adjectival rating of "Outstanding" to the technical proposals of both CWS and Robertson. The Solicitation describes an "Outstanding" rating as a response that contains significant strengths and no weaknesses. The response exceeds the performance and technical requirements defined in the Solicitation. The evaluator has no doubt that the vendor can successfully achieve the requirements in the Solicitation, if the technical and management approach proposed are followed. The vendor acknowledges risk and develops an approach that proactively identifies and mitigates risk, and looks to reduce or eliminate future risk.

52. CBP assigned a "Marginal" rating to the technical proposal of the third offeror.

53. At the debriefing, CBP indicated that the price evaluation did not compare proposed prices to the historical costs of performance under the EG&G Contract. The Agency reported that a consultant had developed an Independent Government Cost Estimate ("IGCE") for the contract. CBP refused to disclose how its consultant determined the IGCE. The Agency also refused to disclose how the Government performed the price analysis (if any).

54. CBP also indicated at the debriefing that the technical evaluation team and the cost evaluation team provided separate analyses to the Contracting Officer. The technical evaluation team and cost evaluation team did not meet.

55. The Agency would not answer questions regarding the Agency's trade-off analysis. The Agency would not verify whether the Contracting Officer had determined that Robertson understood or could perform the solicited tasks at the prices proposed.

56. The Agency told CWS that the only reason CWS did not receive the contract award was that CWS's price was higher than Robertson's price. During a telephonic hearing with this Court on September 27, 2006, Counsel for CBP reiterated that CWS's price was the only factor that prevented CBP from awarding the contract to CWS.

57. The Agency would not explain how it anticipated obtaining full performance of the Robertson Contract for approximately $4 million per year on a fixed-price basis, when the historical cost to perform the same services under the EG&G Contract had been in excess of [redacted]][1] per year on a cost-plus basis.

58. Janice Hill, Chief, Procurement Programs Branch, Office of Finance for CBP, told Mr. William Stearman, President of CWS, at the debriefing that there would be no scope changes on the contract despite the significant price disparity between the CWS proposal and the Robertson proposal.

59. The Agency also would not answer questions regarding the evaluation of problems with Robertson's past performance at PSVF under its prime contract with the United States Marshall's Service.

---

[1] Brackets "[ ]" indicate CWS's proposed redactions. CWS will provide a Proposed Redacted Version of its Amended Complaint to all other parties in the case as required by the Protective Order.

60. Robertson had performed services similar to those in the Solicitation under a contract with the United States Marshall's Service (the "Marshall's Service Contract").

61. Under the Marshall's Service Contract, Robertson did not provide necessary equipment at the GOCO facility, such as power washers, forklifts, and service vehicles.

62. Robertson did not properly care for vehicles in its custody under the Marshall's Service Contract.

63. Robertson's past performance problems arose from an underbid contract that precluded Robertson from performing the scope of work as proposed.

64. Upon terminating Robertson's contract, the Marshall's Service hired EG&G to take over care and custody of the Marshall's Service inventory at PSVF.

65. EG&G subsequently purchased equipment on behalf of the Government, such as forklifts, power washers, service vehicles, and computers, for PSVF.

**D. New Services Regarding Existing Vehicle Inventory**

66. For several months prior to the contract award to Robertson, the Government had been encouraging EG&G to reduce vehicle inventory under the Treasury Contract. Despite EG&G's efforts to comply with the Government's request, EG&G had been unable to liquidate the seized vehicle inventory because, even as vehicles are sold, vehicles continue to be seized on a regular basis. As new vehicles were seized, they became part of the current inventory and EG&G was required to account for them in the SEACATS system, as well as provide associated consignment, towing, maintenance, storage, disposition, and related services.

67. The SEACATS system allows the Government to track the physical custody of each vehicle. The SEACATS system also retains accounting information to meet the Government's auditing requirements. Data maintained in the SEACATS system is updated daily.

The Government can access the data in SEACATS at any time to determine how many cars are currently in inventory in each location. The Government thus has had constant, current knowledge regarding its inventory of seized vehicles.

68. The EG&G Contract provided for a 120-day transition period to begin on the date a successor contract was awarded. This transition plan assumed that the new contractor would become fully functional on day 120. During this transition period, CWS, as EG&G's subcontractor, would have continued vehicle disposition activity.

69. CBP awarded the Robertson Contract only 30 days before the end of the EG&G Contract.

70. When the EG&G Contract expired on September 30, 2006, EG&G still retained custody of approximately 8,000 vehicles valued at $10,000 or less in the four Mexican border states (the "current inventory"). After September 30, 2006, EG&G would no longer have a contract to provide services associated with the current inventory. As a result, CBP needed to hire a contractor to provide essential services relating to the vehicles in the current inventory, such as consignment, towing, maintenance, storage, disposition, and related services.

71. On September 18, 2006, EG&G representatives participated in a meeting with representatives from CBP and Rod Robertson Leasing, an affiliate of Rod Robertson Enterprises, to discuss management of vehicles in the current inventory. Although CBP had knowledge of the current inventory and the need to manage it at the end of the EG&G Contract, CBP waited until less than two weeks prior to the end of the contract to discuss with EG&G the transfer of any vehicles in EG&G's custody.

72. At the September 18, 2006 meeting, CBP informed EG&G and Robertson that CBP wanted EG&G to transfer to CBP the seized vehicles then located at the San Diego GOCO

facility. In turn, CBP representatives stated their intent to then transfer these vehicles to Robertson. During the course of this meeting, CBP also indicated that EG&G was to transfer all vehicles then in EG&G's custody throughout California, Arizona, New Mexico, and Texas to CBP during the week of September 25, 2006 for subsequent transfer to Robertson.

73. In response, Robertson stated that the vehicles currently in EG&G's custody were not covered in the Robertson Contract just awarded by CBP. Robertson noted that the Robertson Contract included zero inventory at the scheduled start of performance on October 1, 2006. Robertson stated that his firm was not prepared to handle this inventory, partially due to the fact that it could not take custody of any vehicles without verifying the inventory and vehicle condition, and obtaining leases for vehicle storage.

74. During the September 18, 2006 meeting, CBP described this arrangement as a "special deal." This deal was news to both EG&G and Robertson, neither of whom had any prior indication of the potential transfer of any of these vehicles.

75. As a result of CBP's agreement to transfer the current inventory of vehicles, Mr. Robertson began contacting EG&G's existing vendors seeking contracts to continue performing towing and storage services.

76. During a meeting on September 22, 2006, CBP's Director of Contracting Operations, Janice Hill, reported to EG&G that she was not aware that CBP needed to transfer the vehicles in EG&G's custody.

77. At that same September 22, 2006 meeting, Ms. Hill stated that the Robertson Contract did not cover services on vehicles seized more than 100 miles from the Mexican border, when in fact the Robertson Contract covers vehicles throughout California, Arizona, New Mexico, and Texas.

78. During a telephonic hearing with this Court on September 27, 2006, Counsel for CBP stated that EG&G and Robertson were CBP's only two options for handling the storage and sales of the vehicles currently in EG&G's custody. Counsel also stated that EG&G and Robertson were the only contractors who could provide the services that had been solicited under the Robertson Contract for vehicles seized after October 1, 2006.

79. CBP undertook to transfer vehicles in the current EG&G inventory to Robertson on or about September 28, 2006, for future disposition by issuing Task Order (the "TO") No. HSBP1006F13809 under GSA Federal Supply Schedule ("FSS") Contract No. GS-10F-0075M (the "GSA Contract").

80. The Statement of Work in the GSA TO included three items, all covering Vehicle Disposition. The Schedule of Supplies/Services Line Items further describes Vehicle Disposition as "Sell and store vehicles SW Border."

81. The GSA Schedule includes other contractors who provide the same services, such as EG&G and Manheim Auctions Inc., which are thus other contractors that could have provided vehicle storage and sales for CBP under a GSA contract.

82. To order services requiring a Statement of Work, CBP was required to provide the Request for Quotation (including the Statement of Work and evaluation criteria) to at least three schedule contractors that offer services that will meet the agency's needs. FAR § 8.405-2(c).

83. Even though CBP considered EG&G one of its two options for storage and sales services on the vehicles to be transferred from EG&G's custody, CBP did not contact EG&G to request a quotation. On information and belief, CBP did not contact Manheim Auctions Inc. or any other GSA contractor to request quotation for storage and sales services on these vehicles.

84. Robertson Leasing Corporation's GSA Revised Pricing, dated August 26, 2004, included prices for towing, storage, repairs, and disposal of vehicles by auction.

85. The TO Statement of Work required disposition of the seized vehicles in accordance with the terms and conditions set forth in the "Vehicle Statement of Work." The referenced "Vehicle Statement of Work" was not included anywhere in the TO.

86. The TO Statement of Work did specify that the contractor must dispose of vehicles in accordance with Sections C-11.1 Vehicle Dismantling/Destruction; C-11.2 Remitted to Owner Violator; C.11.6 to C.11.6.9 Sales and Marketing; and Section C.15.3 to C.15.7.3, Accepting Payment of the Vehicle Statement of Work. The TO Statement of Work did not include any further explanation of these sections. On information and belief, the sections referenced appear to be provisions included in the Robertson Contract SOW.

87. The Robertson Contract Revised SOW required Robertson to provide sales and marketing, planning and scheduling of vehicle disposition, advertising and other planning for vehicle sales, closeout documentation (e.g. certificates of transfer of title), and transfer of funds to the U.S. Treasury Department. This work inherently requires proper documentation to support chain of custody and other regulatory requirements of CBP, including the use of SEACATS to accommodate the recording, accounting, and reporting of applicable requirements and elements of information. The SEACATS requirement is set forth in the Revised SOW § C.11.6. Thus, the work Robertson will perform under the TO requires that Robertson provide personnel with proper clearances to access SEACATS.

88. FAR § 8.405-2(b) states that when a GSA ordering activity requires a statement of work, the statement of work must include any special requirements, such as security

clearances. Personnel who access SEACATS must have a security background check. The TO Statement of Work did not mention these security clearances as a requirement.

89. Robertson's GSA TO does not reference or include pricing for labor to provide inventory tracking, document management, or data entry into the SEACATS system.

90. CWS could have provided CBP with storage and sales services for the current inventory on October 1, 2006.

91. EG&G submitted a proposal to the Department of Treasury to continue to provide services beyond the September 30, 2006 contract term end. EG&G was willing to amend its proposal to the Department of Treasury to include the vehicles in the Mexican border states valued at under $10,000.

92. EG&G had leases in place and could have extended contracts with EG&G's vendors either under the Treasury Contract or some other contract.

93. On September 29, 2006, CBP requested that EG&G submit a proposal to provide storage services for the vehicles currently in EG&G's custody.

94. On September 30, 2006, CBP issued notice to EG&G directing EG&G to provide "continuity of services" under the EG&G Contract with the United States Treasury, pursuant to clause I.1, FAR § 52.237.3 of that contract. That clause provides for continued, uninterrupted services under an existing contract for up to 90 days after contract expiration. EG&G has been directed to continue vehicle storage for vehicles in the current inventory valued at less than $10,000 in California, Arizona, New Mexico, and Texas, and to perform activities necessary to assist with transition of these vehicles to Robertson.

95. CWS built carrying costs into its proposed prices in light of CBP's confirmations during the Solicitation that the contract would start with zero inventory. This lack of inventory would result in minimal, if any, revenue generation during the first few months of the contract. Despite the absence of initial inventory, the Solicitation required that the contractor be prepared to provide all required services from contract commencement, and thus provide vehicle storage facilities from day one. Had the Solicitation included the transfer of inventory, CWS could have substantially reduced its proposed prices.

96. The money earned by providing storage and sales services on the transferred inventory provides startup funding for Robertson to begin performance on the Robertson Contract.

**E. Post-Award Changes to Solicitation Work Scope and Requirements**

97. During the September 18, 2006 meeting, the Government also suggested that it could assist Robertson with the backlog of computer entry that will result from the transfer of EG&G's current inventory. In particular, one Government employee may be creating a special computer script to accelerate the transfer of current inventory through the SEACATS system. This program will reduce both the paperwork and SEACATS data entry required to transfer the current inventory of vehicles. Robertson will save hundreds of manhours as a result.

98. Even if CBP reduces the paperwork and SEACATS data entry requirements on the transferred inventory, CBP will still need Robertson to provide all closeout documentation and related SEACATS entries for tracking inventory and auditing purposes.

99. On information and belief, the Government relaxed its requirement that Robertson enter SEACATS data within two days, because Robertson is not positioned to access SEACATS at the start of the Robertson Contract.

100. Had CWS been provided the opportunity to propose prices based on reduced SEACATS requirements, CWS could have significantly reduced its price proposal.

101. Under the EG&G Contract, EG&G leased and maintained a vehicle storage facility at Nogales, Arizona.

102. During a meeting with EG&G, CBP, and Robertson, Mr. Robertson stated that Robertson had not included the Nogales vehicle storage facility and equipment in its proposal.

103. CBP has persuaded Robertson to take over operations at EG&G's facility in Nogales, Arizona. Until that time, Robertson had commenced constructing a new facility in Tucson. A new facility would require the installation of a Government secured communications line to access the SEACATS system. As a result of discussions regarding Robertson taking over EG&G's Nogales facility, Mr. Robertson ceased construction of the Tucson facility and entered into negotiations with EG&G's current landlord to secure a lease for the Nogales facility.

104. The Government requested that EG&G provide to CBP an inventory of all GFE currently in use at both the GOCO and Nogales facilities. CBP provided this inventory to Mr. Robertson and provided Mr. Robertson with the opportunity to select whatever GFE he wanted from this inventory. The inventory included forklifts, power washers, service vehicles, and computer equipment, among other items that would not be provided under the Solicitation.

105. CBP is arranging to EG&G to transfer the entire Nogales facility to Robertson, including all GFE located in this facility. CBP has also transferred all GFE currently located at the GOCO facility, contrary to the Solicitation's provision that there would be no GFE provided under the contract.

106. CWS proposed its vehicle storage locations and facilities as required under the Solicitation. CWS was not permitted to base its proposed prices on CBP transferring the entire

Nogales facility at the expense of the Government. Rather, CWS had to assume costs associated with storage facilities and necessary equipment in its proposal.

107. CWS assumed the costs for equipment at the GOCO facility and all other locations in developing its proposal, as required by the Solicitation. CWS was not permitted to base its proposed prices on the transfer of GFE.

108. Had the Solicitation included the transfer of GFE, CWS could have substantially reduced its proposed prices.

109. Upon information and belief, Robertson did not provide completed security packages for each employee needing access to SEACATS within ten calendar days after the award of the contract. Robertson also underestimated the amount of paperwork and data entry required for full contract performance and did not propose prices or labor sufficient to cover these costs.

110. CWS had secured from current EG&G employees performing SEACATS services to become CWS employees upon contract award, and included these letters in the CWS proposal.

111. After the September 18, 2006 meeting, Mr. Robertson approached EG&G and requested EG&G's permission to interview EG&G personnel who already possessed clearances to access the SEACATS system. Robertson had not previously contacted EG&G employees with SEACATS clearances to join the Robertson team or disclosed the names of these employees to the Government.

112. Several of the individuals whom Mr. Robertson had interviewed subsequently reported to EG&G that Robertson offered compensation much lower than their current compensation for the same work. They also reported having insisted on comparable salaries,

and after some negotiation Robertson acquiesced to raise his offers to levels acceptable to some of these individuals. As of September 29, 2006, Robertson had hired five EG&G employees from the GOCO facility and three or four individuals from EG&G's Nogales, Arizona facility.

113. CWS was not permitted to base its proposal costs on CBP providing any reductions of paperwork or manpower. In fact, CWS's proposal specifically reserved the right to reallocate cost according to any removal or reduction in usage of SEACATS.

114. As of October 1, 2006, Robertson's website was not 508 compliant, as the Solicitation required.

115. In comparison, CWS spent hundreds of thousands of dollars bringing the CWS website into compliance with the Solicitation's requirement before award of the contract. As a result, CWS would be 508 compliant from the first day of the contract, as required by the Solicitation.

### F. The Agency's Evaluation of Robertson's Price Proposal

116. The Agency reported that Robertson's proposed price of approximately $4 million per year was consistent with the third offeror's proposed price, as well as with the IGCE's price of **[** [redacted] **]** for the total five-year contract.

117. During a telephonic hearing with this Court on September 27, 2006, Counsel for CBP could not explain the basis for the IGCE, but suggested that the IGCE was based upon information from the field, including subcontractors.

118. CBP provided a copy of the IGCE to Counsel for CWS on September 28, 2006.

119. The IGCE was apparently prepared in late December 2005. The IGCE bears little relationship to the work that the Agency described in the Solicitation issued March 10, 2006 (with later amendments).

120. The IGCE was inconsistent with the workload projected in the Solicitation. The SOW indicated that offerors should anticipate an annual workload of 33,000 seized vehicles to be towed, consigned, received, transferred and processed in the SEACATS database. Yet, the IGCE projected **[**[redacted]**]**

121. The workload projection also assumed a starting inventory of **[**[redacted]**]** vehicles. The SOW and later Agency communications were emphatic that there would be no initial inventory.

122. The Solicitation originally estimated the maximum quantity of services at $20 million dollars including all option periods. This estimate was later raised to $30 million in response to a question stating that the cost to provide services for CLINs B, C, and D (towing/transportation, consignment, and receipt/transfer) alone for the 33,000 vehicles projected in the SOW would exceed the stated amount, prior even to taking into consideration all the other requirements of the SOW.

123. With regard to labor, the IGCE projects **[**[redacted]**]** employees. The IGCE projects no employees whatsoever to actually manipulate and maintain seized and stored vehicles. There are thus no personnel projected to drive forklifts or otherwise move cars around any storage facility (even the San Diego GOCO, at a minimum), much less secure or maintain them.

124. The IGCE does not project any employees or other costs to handle the extensive SEACATS data entry requirements.

125. The IGCE did not project costs for Material or Other Direct Costs (ODCs). This presumed that the contractor will incur no costs for, among other things required to perform the solicited work: computers, telephone and data lines, forklifts, company vehicles, vehicle

maintenance equipment, office equipment and supplies, furniture, fuel, warehouse supplies, facility security equipment, marketing and sales materials.

126. The IGCE did not project costs for vehicle destruction, although the Solicitation instructed offerors to assume the destruction of 3000 vehicles per year. The Solicitation further prescribed specific requirements for that undertaking. Transporting vehicles to a destruction facility or vendor, and paying associated charges, is not a cost-free enterprise.

127. The IGCE also did not appear to include any costs with respect to three other specific tasks called for by the Solicitation: CLIN 0001C--Receipt and Transfer; CLIN 0001E--Vehicle Identification and Physical Accountability; CLIN 0001L--Monthly management reports.

128. There is no indication that the consultant who prepared the IGCE has any background or experience in the field of vehicle storage and management.

129. The IGCE was reportedly based on a "similar estimate" developed in another competition, which was not included with the IGCE.

130. The IGCE provided little or no description of the bases for various estimates or of how various rates were prepared, and no supporting information indicating any reason to consider the estimates valid.

131. Despite repeated reference to a "cost model" that was evidently the source of most figures presented, the IGCE did not describe how it was prepared, how it operates or the information upon which it depends.

132. The IGCE does not refer to any market research or data regarding actual vendor costs.

133. The only other price information that the Agency has cited as part of its price analysis in connection with the Solicitation was the price proposal submitted by another offeror whose technical proposal was rated "Marginal."

134. The actual historical costs of EG&G, an award winning incumbent, reflect dramatically different and unavoidable marketplace costs well above the prices Robertson proposed

135. According to information in the Government's SEACATS database, the costs only for non-EG&G vendor towing and storage of seized and forfeited vehicles valued at $10,000 and less in California, Arizona, and Texas in Fiscal Year 2006 was **[**[redacted]**.]** EG&G periodically competes this vendor provided work to assure that the costs incurred reflect marketplace prices.

136. Robertson proposed only $5 per vehicle to cover all SEACATS requirements set forth in the SOW § C.13. At a minimum, this price included all SEACATS data entry, including labor. At least **[**[redacted]**]** employees currently perform work to meet the same SEACATS requirements under the EG&G Contract.

137. Vehicles seized by CBP are x-rayed after seizure. Tow truck operators often encounter extended delays at the x-ray facility. These delays are referred to as "wait time." The wait time can last several hours and a tow truck operator charges for this time because its employee and equipment are engaged.

138. During the meeting on September 18th, Mr. Robertson explained that the towing prices proposed by Robertson did not account for long "wait times" for x-rays or second tows due to x-ray failure.

139. Sometime after the September 18, 2006 meeting, Mr. Robertson approached some of EG&G's current vendors to solicit contracts for storage of vehicles. Some of EG&G's vendors subsequently reported to EG&G that Mr. Robertson offered significantly below-market prices to perform the same services. These vendors also reported that accepting the prices proposed by Mr. Robertson would cause their small businesses financial hardship.

**COUNT I**
**(The Agency Violated the Full and Open Competition Requirements of CICA)**

140. CWS realleges each and every allegation set forth in paragraphs 1 through 139 above as if set forth herein in their entirety.

141. An actual and justiciable controversy exists between CWS and CBP concerning the competition and award of a contract under the Solicitation.

142. CICA requires full and open competition of Federal Procurements.

143. CBP evaded full and open competition by failing to articulate its true requirements in the Solicitation, and instead procured services improperly through independent sole-source contracts and uncompeted task orders.

144. CBP also evaded competition by issuing out-of-scope post-award modifications to the contract awarded under the Solicitation, and otherwise relaxing Solicitation requirements. These actions changed the requirements and criteria disclosed in the Solicitation. As a result, CBP materially changed the basis upon which the competition had been conducted.

145. In light of the nature and extent of the post-award modifications, relaxed requirements, and the Agency's efforts to evade and undermine full and open competition to procure the services awarded to Robertson, pursuant to the Solicitation and otherwise, CBP has violated the competition requirements of CICA.

146. The Agency's actions prejudiced CWS because CWS was not afforded the opportunity to submit a bid based on the Agency's actual requirements, and to fairly compete for the services for which CBP is contracting with Robertson.

147. The Agency’s out-of-scope modifications to the Robertson Contract constitute an unlawful, uncompetitive sole-source contract award to Robertson, for which CWS was denied an opportunity to compete.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

**COUNT II**
**(The Agency Improperly Awarded a Task Order to Robertson under Robertson's GSA Contract)**

148. CWS realleges each and every allegation set forth in paragraphs 1 through 147 above as if set forth herein in their entirety.

149. When an Agency intends to order from an existing GSA FSS contractor, the Agency must follow GSA FSS procedures.

150. GSA FSS procedures required CBP to provide a Request for Quotation to at least three contractor that offer services that will meet CBP's needs.

151. CBP did not solicit quotations from at least three GSA FSS contractors.

152. When an Agency orders from an existing GSA FSS contractor, all items the Agency orders must with within the scope of the contractor's GSA contract.

153. To provide proper tracking of current inventory transferred to Robertson pursuant to the Task Order, Robertson will need to provide labor for entering data into the SEACATS system.

154. Providing data entry into the SEACATS system is not within the scope of Robertson's GSA Contract.

155. The Agency did not follow proper procedures for awarding the Task Order to Robertson, thus, the transfer of the vehicles currently in inventory constitutes an illegal sole-source contract or an improper out-of-scope post-award modification to the Robertson Contract.

156. The Agency’s out-of-scope modifications to the Robertson Contract constitute an unlawful, uncompetitive sole-source contract award to Robertson, for which CWS was denied an opportunity to compete.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

## COUNT III
## (The Agency's Contract Covering Services for the Vehicles in the Current Inventory Constituted an Unlawful Sole-Source Contract with Robertson)

157. CWS realleges each and every allegation set forth in paragraphs 1 through 156 above as if set forth herein in their entirety.

158. CICA permits noncompetitive acquisitions in specified circumstances, such as when the agency's need for the services is of unusual and compelling urgency, and they are available from only one responsible source.

159. CICA does not permit noncompetitive procedures in situations that indicate a lack of advance planning by contracting officials.

160. CBP failed to take action with regard to securing a contractor to provide storage and sales services for the current inventory until late September 2006, only shortly before the end of the EG&G Treasury Contract.

161. CBP's lack of advanced planning creating its own unusual and compelling urgency.

162. Robertson was not the only responsible source from which CBP could have obtained services for vehicle storage and sales.

163. The Agency's issuance of a Task Order for vehicle storage and sales to Robertson under Robertson's GSA Contract violated CICA because the Agency's need for the services was not of unusual and compelling urgency, and the services were available from only one responsible source.

164. The Agency did not follow proper competitive procedures for awarding the contract for vehicle storage and sales for the current inventory to Robertson, thus, the transfer of the vehicles in the current inventory constitutes a post-award modification to the Robertson Contract.

165. The Agency’s out-of-scope modifications to the Robertson Contract constitute an unlawful, uncompetitive sole-source contract award to Robertson, for which CWS was denied an opportunity to compete.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

**COUNT IV**
**(The Agency's Technical Evaluation was Unreasonable)**

166. CWS realleges each and every allegation set forth in paragraphs 1 through 165 above as if set forth herein in their entirety.

167. Section M of the Solicitation set forth the evaluation criteria for the Technical Evaluation to include an evaluation of the offeror's Technical Approach, Management Approach, and Past Performance.

168. The evaluation of the offeror's Technical Approach required that the offeror comprehend the work requirements and understand the complexity and level of effort required set forth in the SOW.

169. Robertson's statements and actions, including inadequate pricing, demonstrate that Robertson did not understand the technical requirements and associated costs to perform the Statement of Work contemplated by the Solicitation.

170. CBP's post-award modifications, relaxation of requirements, and sole-source contracting to Robertson demonstrate that Robertson did not comprehend the work requirements and understand the complexity and level of effort required to perform the contract.

171. The Technical Approach evaluation also required CBP to evaluate the offeror's proposed approach for accomplishing the work requirements set forth in the Solicitation, specifically addressing Vehicle Management, Accounting and Finance, SEACATS Implementation, and Sales & Marketing.

172. Subsequent to the Robertson Contract award, CBP has engaged in activities that indicate that Robertson did not understand how to implement SEACATS.

173. CBP's post-award modifications further demonstrate that Robertson's proposed approach could not accomplish the work requirements at the proposed prices.

174. CBP's evaluation of Robertson did not consider problems with Robertson's past performance at PSVF under its prime contract with the United States Marshall's Service.

175. CBP's evaluation did not reflect Robertson's inability to perform the technical solicited requirements at the prices proposed.

176. The evaluation of the offeror's Management Approach required an evaluation of the offeror's organizational structure as well as the proposed contract management approach.

177. The Agency's post-award modifications include transfer of the current EG&G inventory, the transfer of the Nogales facility and equipment, the transfer of equipment at the Nogales and GOCO facilities, and reductions in the paperwork and data entry requirements set forth in the Solicitation.

178. CBP's post-award modifications were not contemplated in the Robertson proposal.

179. The Agency was unreasonable in assigning a rating of "Outstanding" to Robertson because Robertson's proposal does not exceed the performance and technical requirements defined in the Solicitation.

180. The Agency's flawed technical evaluation prejudiced CWS because CWS was not afforded the opportunity to submit a proposal based on the changed requirements.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

**COUNT V**
**(The Agency's Price Evaluation was Unreasonable)**

181. CWS realleges each and every allegation set forth in paragraphs 1 through 180 above as if set forth herein in their entirety.

182. The Solicitation required that CBP conduct a price analysis of the offerors' price proposals in response to the SOW.

183. The SOW covers the same requirements as those currently being performed pursuant to the EG&G Contract.

184. CWS has been performing the same work as that required by the SOW pursuant to the CWS Subcontract.

185. It was not reasonable for the Agency to award the contract to Robertson, which proposed prices that ignored or underestimated the self-evident costs to perform the solicited work.

186. Robertson's unreasonably low prices indicated that Robertson did not understand and would not be able to fulfill the technical requirements of the Solicitation.

187. CBP had actual historical cost information available regarding the solicited services and was thus capable of performing this additional investigation into the reasonableness of the offered prices.

188. Additionally, the prices proposed by Robertson do not reflect current market prices and are thus unreasonable.

189. The Agency's flawed price evaluation prejudiced CWS because CWS was not afforded the opportunity to submit a bid based on the post-award requirements that would have reduced CWS's proposed prices.

190. The Agency unreasonably relied on an IGCE that did not accurately reflect the scope of work and requirements set forth in the Solicitation.

191. It was an arbitrary and capricious abuse of discretion for the Agency to have based its price analysis on a flawed IGCE and pricing from a "Marginal" offeror, while ignoring

vast disparities between the contract awardee's prices and the competitive prices of an incumbent contractor (CWS), actual historical costs, and marketplace price data.

192. The Agency's decision to ignore pricing disparities was an abuse of the discretion afforded to make reasonable judgments.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

## COUNT VI
## (The Agency's Determination that Robertson Provided the Best Value was Unreasonable)

193. CWS realleges each and every allegation set forth in paragraphs 1 through 192 above as if set forth herein in their entirety.

194. Section M of the Solicitation required CBP to award the contract to the offeror whose proposal contained the best value to the Government. The best value would be determined by a trade-off analysis, comparing differences in the value of the technical features with differences in cost to the Government.

195. The technical evaluation team and the cost evaluation team never met to discuss the ability of the offerors' to perform at the prices proposed.

196. The Contracting Officer based her determination upon a flawed technical evaluation and a flawed price analysis. Thus, any trade-off analysis was flawed as a result, to CWS's prejudice.

197. The Agency's flawed trade-off analysis prejudiced CWS because CWS was not afforded the opportunity to submit a bid based on the post-award requirements that would have reduced CWS's proposed prices.

WHEREFORE, CWS requests that the Court enter judgment in its favor against the United States and request corrective action, including terminating the Robertson Contract and competitively resoliciting the requirements according to the Agency's actual needs.

**PRAYER FOR RELIEF**

WHEREFORE, CWS respectfully requests that the Court:

a. grant CWS the relief requested in the Complaint;

b. award CWS its reasonable fees, costs, interest, and expenses incurred in prosecuting its Complaint; and

c. grant CWS such other and further relief as the Court deems just and proper.

Dated: October 6, 2006

Respectfully submitted,

HOLLAND & KNIGHT LLP

s/ Mark D. Colley

Mark D. Colley
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 955-3000 – phone
(202) 955-5564 – fax
*Counsel for CWS Marketing Group, Inc.*

Of Counsel:
Kara L. Daniels
Cameron W. Fogle
Allison V. Feierabend
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 955-3000 – phone
(202) 955-5564 – fax

# 4095255_v1